# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 18-60868

————

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2019

Lyle W. Cayce
Clerk

JACKSON WOMEN'S HEALTH ORGANIZATION, on behalf of itself and its patients; SACHEEN CARR-ELLIS, M.D., M.P.H., on behalf of herself and her patients,

>    Plaintiffs - Appellees

v.

THOMAS E. DOBBS, M.D., M.P.H., in his official capacity as State Health Officer of the Mississippi Department of Health; KENNETH CLEVELAND, M.D., in his official capacity as Executive Director of the Mississippi State Board of Medical Licensure,

>    Defendants - Appellants

————

Appeal from the United States District Court
for the Southern District of Mississippi

————

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge.

This case concerns a Mississippi law that prohibits abortions, with limited exceptions, after 15 weeks' gestational age. The central question before us is whether this law is an unconstitutional ban on pre-viability abortions. In an unbroken line dating to *Roe v. Wade*, the Supreme Court's abortion cases have established (and affirmed, and re-affirmed) a woman's right to choose an abortion before viability. States may *regulate* abortion procedures prior to viability so long as they do not impose an undue burden on the woman's right,

No. 18-60868

but they may not ban abortions. The law at issue is a ban. Thus, we affirm the district court's invalidation of the law, as well as its discovery rulings and its award of permanent injunctive relief.

## I.

On March 19, 2018, Mississippi enacted House Bill 1510, entitled the "Gestational Age Act" ("the Act").[1] The Act provides that, in most cases, an abortion cannot be performed until a physician first determines and documents a fetus's probable gestational age.[2] Then,

> [e]xcept in a medical emergency or in the case of a severe fetal abnormality, a person shall not perform, induce, or attempt to perform or induce an abortion of an unborn human being if the probable gestational age of the unborn human being has been determined to be greater than fifteen (15) weeks.[3]

The legislature found that most abortions performed after 15 weeks' gestation are dilation and evacuation procedures and that "the intentional commitment of such acts . . . is a barbaric practice, dangerous for the maternal patient, and demeaning to the medical profession." It also found that developments in medical knowledge of prenatal development have shown that,

---

[1] Gestational Age Act, ch. 393, § 1, 2018 Miss. Laws (codified at MISS. CODE ANN. § 41–41–191).

[2] Gestational age is measured by the time elapsed since the woman's last menstrual period (LMP).

[3] "Severe fetal abnormality" is defined as "a life-threatening physical condition that, in reasonable medical judgment, regardless of the provision of life-saving medical treatment, is incompatible with life outside the womb." "Medical emergency" is defined as a condition in which "an abortion is necessary to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition arising from the pregnancy itself, or when the continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function." Also, the medical licenses of doctors who violate the Act "shall be suspended or revoked[.]"

No. 18-60868

for example, the abilities to open and close fingers and sense outside stimulations develop at 12 weeks' gestation. Finally, it found that abortion carries risks to maternal health that increase with gestational age, and it noted that Mississippi has legitimate interests in protecting women's health.

On the day the Act was signed into law, Jackson Women's Health Organization, the only licensed abortion facility in Mississippi, and one of its doctors, Dr. Sacheen Carr-Ellis (collectively "the Clinic"), filed suit challenging the Act and requesting an emergency temporary restraining order. The next day, the district court held a hearing and issued a temporary restraining order.[4]

The district court also granted the Clinic's motion to limit discovery to the issue of viability. It determined that the Act "is effectively a ban on all elective abortions after 15 weeks," and "[g]iven the Supreme Court's viability framework, that ban's lawfulness hinges on a single question: whether the 15-week mark is before or after viability." Under this view, Mississippi's asserted state interests were irrelevant and the State's discovery was aimed at rejecting the Supreme Court's viability framework, not at defending the Act within that framework.

The State served extensive written discovery requests, which the Clinic opposed to the extent they reached beyond the viability question. The State also designated Dr. Maureen Condic as an expert in neurological embryology

---

[4] The Clinic later amended its complaint, adding five new challenges to other Mississippi abortion laws. The district court, invoking its discretion under Federal Rule of Civil Procedure 42, bifurcated the case: Part One covers the challenges to the 2018 Act, while Part Two covers the challenges to the earlier-enacted Mississippi laws. The district court denied the State's motion to reconsider this bifurcation. This appeal only concerns Part One; Part Two remains at the district court.

No. 18-60868

and fetal development. On the Clinic's motion, the district court excluded Dr. Condic's expert report because the State had conceded that it pertained to the issue of fetal pain and not to viability.[5]

Discovery concluded and the Clinic moved for summary judgment. The Clinic submitted evidence that viability is medically impossible at 15 weeks LMP. The State conceded that it had identified no medical evidence that a fetus would be viable at 15 weeks. It also conceded that the Act bans abortions for some women prior to viability. Still, the State opposed summary judgment because the Act "merely limits the time frame" in which women must decide to have an abortion and because the Supreme Court has left unanswered whether Mississippi's asserted state interests can justify the Act.

The district court granted summary judgment to the Clinic. The Act was unconstitutional, the court held, because "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."[6] As summarized by the district court, "[t]he record is clear: States may not ban abortions prior to viability; 15 weeks lmp is prior to viability; and plaintiffs provide abortion services to Mississippi residents after 15 weeks lmp."[7] Finally, rejecting the State's argument that the Clinic could only seek an injunction up to 16 weeks LMP (since the Clinic does not provide abortions after that point), the district court permanently enjoined the Act in all applications.[8]

---

[5] The district court denied the Clinic's motion in part, allowing the State to proffer the report and thus preserve the evidentiary issue.

[6] *Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 539 (S.D. Miss. 2018) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 883, 860 (1992) (plurality opinion)).

[7] *Id.*

[8] *Id.* at 543–45.

No. 18-60868

## II.

This Court reviews a grant of summary judgment de novo, applying the same standard as the district court.[9] Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] A district court's decision to limit discovery is reviewed for abuse of discretion,[11] as is a district court's tailoring of injunctive relief.[12]

## III.

The State raises five main arguments on appeal: (1) the Supreme Court's decision in *Gonzales v. Carhart* preserves the possibility that a "state's interest in protecting unborn life can justify a pre-viability restriction on abortion";[13] (2) the district court abused its discretion by restricting discovery, thus stymying the State's effort to develop the record; (3) the district court failed to defer to the legislature's findings; (4) the Act imposes no undue burden, as it only shrinks by one week the window in which women can elect to have abortions; and (5) the Clinic lacked standing to challenge the Act's application after 16 weeks, the point at which the Clinic stops providing abortions under its own procedures.

These issues collapse to three: whether the summary-judgment order properly applies the Supreme Court's abortion jurisprudence, whether limiting discovery to viability was an abuse of discretion, and whether the scope of

---

[9] *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010).

[10] FED. R. CIV. P. 56(a).

[11] *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011).

[12] *Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 323 (5th Cir. 2005).

[13] *Gonzales*, 55 U.S. 124 (2007).

No. 18-60868

injunctive relief was proper.

## A.

In *Roe v. Wade*, the Supreme Court held that the right to privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."[14] *Casey* "reaffirm[ed]" *Roe*'s "recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."[15]

In *Gonzales*, the case on which the State's argument relies, the Court "assume[d] the following principles":

> Before viability, a State "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." It also may not impose upon this right an undue burden, which exists if a regulation's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Casey*, in short, struck a balance.[16]

The district court applied these principles straightforwardly. It

---

[14] 410 U.S. 113, 153 (1973).

[15] *Casey*, 505 U.S. at 846; *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016) (citing *Casey* for the proposition that a law unduly burdens a woman's right to choose an abortion it if bans abortion "before the fetus attains viability").

[16] *Gonzales*, 550 U.S. at 146 (citations omitted) (quoting *Casey*, 505 U.S. at 879, 878, and 877). The State makes much of the Court's assuming, rather than reaffirming or otherwise stating conclusively, these principles. But an assumption of a prior holding's validity is not a reversal of that holding. Nothing in *Gonzales* signals that we should decline to apply *Roe* and its descendants.

No. 18-60868

recognized, as the controlling standard in this case, *Casey*'s holding that no state interest can justify a pre-viability abortion ban. The State conceded that it had no evidence of viability at 15 weeks LMP and that it is the Mississippi Department of Health's position that a fetus cannot survive outside the womb at 15 weeks LMP; accordingly, the court concluded that the Act prohibits pre-viability abortions.[17] The Act's consequences were undisputed: Dr. Carr-Ellis averred that the Clinic provides an abortion to at least one woman per week after 14 weeks 6 days LMP, so the Act would force these women to carry their pregnancies to term against their will or to leave the state for an abortion.[18] There was thus no dispute that the Act prohibited pre-viability abortions, which ended the district court's analysis.

This result accords with those reached by the circuit courts that have addressed similar abortion prohibitions. For example, the Ninth Circuit invalidated a ban at 20 weeks in *Isaacson v. Horne*;[19] the Eighth Circuit invalidated bans at 6 and 12 weeks in *MKB Management Corporation v. Stenehjem*[20] and *Edwards v. Beck*,[21] respectively; and the Tenth Circuit

---

[17] *Jackson*, 349 F. Supp. 3d at 540.

[18] *Id.*

[19] 716 F.3d 1213, 1225 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014); *see also id.* at 1217 (observing that the Supreme Court has been "unalterably clear" that "a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable"). The Ninth Circuit also invalidated Idaho's 20-week ban in *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) ("Because § 18–505 places an arbitrary time limit on when women can obtain abortions, the statute is unconstitutional.").

[20] 795 F.3d 768, 773 (8th Cir. 2015) (affirming a grant of summary judgment because a 6-week ban "generally prohibits abortions before viability"), *cert. denied*, 136 S. Ct. 981 (2016).

[21] 786 F.3d 1113, 1117 (8th Cir. 2015) ("By banning abortions after 12 weeks' gestation, the Act prohibits women from making the ultimate decision to terminate a pregnancy at a point before viability."), *cert. denied*, 136 S. Ct. 895 (2016).

No. 18-60868

invalidated a ban at 22 weeks in *Jane v. Bangerter*.[22] Recent district court decisions have followed suit.[23]

The State's primary constitutional argument on appeal is that the district court should have accounted for the State's interests and then determined whether the Act imposes an undue burden. The State argues that if the district court had done so, and if it had recognized that viability is not the only proper consideration in assessing the Act's lawfulness, it would have determined that the Act is constitutional.

The parties dispute whether the Act *bans* abortions or *regulates* them, a distinction vital to evaluating the Act's lawfulness. Pre-viability regulations of abortion procedures can pass constitutional muster if they do not pose an undue burden, which requires the weighing of state interests against the burden on a woman's right to elective abortion.[24] If the Act is a regulation, then the State's interests should have been considered. Prohibitions on pre-viability abortions, however, are unconstitutional regardless of the State's interests because "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."[25] "[V]iability marks the

---

[22] 102 F.3d 1112, 1115 (10th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997).

[23] *See Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 801 (S.D. Ohio 2019) (enjoining Ohio's 6-week ban); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178, 2019 WL 1233575, at *2 (W.D. Ky. Mar. 15, 2019) (enjoining Kentucky's 6-week ban); *Bryant v. Woodall*, No. 1:16-CV-1368, 2019 WL 1326900, at *14–15 (M.D.N.C. Mar. 25, 2019) (invalidating North Carolina's 20-week ban); *Little Rock Family Planning Servs. v. Rutledge*, No. 4:19-CV-449, 2019 WL 3679623, at *1 (E.D. Ark. Aug. 6, 2019) (enjoining Arkansas's 18-week ban).

[24] *See Casey*, 505 U.S. at 878 ("To promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. These measures must not be an undue burden on the right.").

[25] *Id.* at 879.

earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."[26] Thus, if the Act is a ban, the State's interests cannot outweigh the woman's right to choose an abortion and the undue-burden balancing test has no place in this case.

The State casts the Act as a mere regulation of the time period during which abortions may be performed, akin to a regulation of the time, place, or manner of speech.[27] The State argues the Act is not a ban because it allows abortions before 15 weeks LMP, it contains exceptions, and, practically speaking, it only limits the relevant time frame by one week, since the Clinic (the only abortion provider in Mississippi) does not perform abortions after 16 weeks LMP.

Finally, the State likens the Act to the federal Partial-Birth Abortion Ban Act of 2003 that was upheld in *Gonzales v. Carhart*.[28] The *Gonzales* Court emphasized congressional findings that partial-birth abortion contravened governmental interests in "the dignity of human life" and "the integrity and ethics of the medical profession."[29] Here, the State asserts the same interests on behalf of Mississippi, and likens the "brutal and inhumane" partial-birth abortion procedure to the State's evidence of purported fetal pain.

In the State's view, the district court should have evaluated, as did the *Gonzales* Court, whether the Act "place[s] a substantial obstacle in the path of

---

[26] *Id.* at 860.

[27] The district court observed that the Act's title betrays its effect: "The Act's full title is 'An Act to be Known As the Gestational Age Act; To Prohibit Abortions After 15 Weeks' Gestation.' 'Ban' and 'prohibit' are synonyms. This Act is a ban. It is not a regulation." *Jackson*, 349 F. Supp. 3d at 541.

[28] *See Gonzales*, 550 U.S. at 147.

[29] *Id.* at 157.

No. 18-60868

a woman seeking an abortion before the fetus attains viability[.]"[30] Under this analysis, the State contends the Act "would likely be upheld, since it allows women up to three and a half months to decide whether to have an abortion." Thus, the State argues that the relatively few women "who would be required to make their ultimate decision whether to have an abortion one week earlier" do not outweigh "the harm to the State by requiring it to permit inhumane abortion procedures which cause a fetus to experience pain—a factor the Supreme Court has never explicitly addressed."[31]

These arguments do not save the Act from encroaching on the holding of *Casey*. The Act pegs the availability of abortions to a specific gestational age that undisputedly prevents the abortions of some non-viable fetuses. It is a prohibition on pre-viability abortion.[32] *Gonzales* is distinguishable for the same reason that any case considering a pre-viability *regulation* is distinguishable: laws that limit certain methods of abortion or impose certain requirements on those seeking abortions are distinct under *Casey* from those that prevent women from choosing to have abortions before viability.

In recognition of state interests, *Casey* allows restrictions on pre-viability abortions that are not an undue burden on a woman's right to elective abortion. The ban on partial-birth abortions in *Gonzales* is one example. But the Act is not such a restriction, so this legal principle, while valid, has no application here. *Casey* clarified that the "adoption of the undue burden analysis does not

---

[30] *Id.* at 156 (quoting *Casey*, 505 U.S. at 878)).

[31] In 2017, the State notes, 90 women had abortions at the Clinic after 15 weeks LMP.

[32] The Ninth Circuit rejected similar arguments in *Isaacson*, which stated that a prohibition at a certain pre-viability point "does not merely 'encourage' women to make a decision regarding abortion earlier than Supreme Court cases require; it forces them to do so." 716 F.3d at 1227.

No. 18-60868

disturb the central holding of *Roe*": "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."[33] This "central holding of *Roe*" is what the Act implicates here, as the State asks us to extend the undue-burden analysis past *Casey*'s clear demarcation. That the Act does not ban all abortions, but only those after 15 weeks LMP, does not change the fact that viability is the critical point.[34] Nor is the number of affected women relevant to the Act's lawfulness, as *Casey* made clear that "a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability."[35]

The Act is a ban on certain pre-viability abortions, which *Casey* does not tolerate and which presents a situation unlike that in *Gonzales*. With respect to bans like this one, the Supreme Court's viability framework has already balanced the State's asserted interests and found them wanting: Until viability, it is for the woman, not the state, to weigh any risks to maternal health and to consider personal values and beliefs in deciding whether to have an abortion.[36]

## B.

Next, the State challenges the district court's decisions limiting discovery to the issue of viability and excluding expert testimony regarding fetal pain perception.

---

[33] *Casey*, 505 U.S. at 879.

[34] *See Colautti v. Franklin*, 439 U.S. 379, 388–89 (1979) ("Because [the point of viability] may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus. Viability is the critical point.").

[35] *Casey*, 505 U.S. at 879 (emphasis added).

[36] *See id.* at 846, 853.

No. 18-60868

The scope of discovery is generally broad and allows for "any nonprivileged matter that is relevant to any party's claim or defense."[37] A court is afforded broad discretion when deciding discovery matters, but the court abuses its discretion when its decision is based on an erroneous view of the law.[38] Still, we "will only vacate a court's judgment if the court's abuse of discretion affected the substantial rights of the appellant."[39]

The State argues the district court abused its discretion by limiting discovery to one issue—whether 15 weeks LMP is before or after viability. The State seeks a remand for development of a complete record in conjunction with the discovery being conducted for Part Two of this litigation. If a district court does not need to consider new evidence, the State argues, courts will remain "willfully blind" to scientific developments and the Supreme Court can never see a full record in an abortion case.

But the result of the State's challenges to the district court's discovery rulings flows from our holding that the Act unconstitutionally bans pre-viability abortions. No state interest is constitutionally adequate to ban abortions before viability, so the interests advanced here are legally irrelevant to the sole issue necessary to decide the Clinic's constitutional challenge. Bound as the district court was by the viability framework, it was within its discretion to exclude this evidence.[40]

---

[37] *See* FED. R. CIV. P. 26(b)(1).

[38] *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011) (citing *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387 (5th Cir. 2009)).

[39] *Id.* (citing *Marathon Fin. Ins., Inc., RRG v. Ford Motor Co.*, 591 F.3d 458, 469 (5th Cir. 2009)).

[40] The Eighth Circuit, in *MKB Management*, affirmed the same discovery limitation that the district court imposed here—since "viability presents the central issue," an "order limiting discovery to the issue of viability" was not an abuse of discretion. 795 F.3d at 773 n.4.

12

No. 18-60868

## C.

Finally, the State contends that the district court overreached in fashioning the permanent injunctive relief it granted to the Clinic. It argues that (1) the Clinic lacks standing to bring a facial challenge because the Clinic does not perform abortions after 16 weeks LMP and (2) the relief awarded by the district court is not narrowly tailored to the Clinic's alleged injury.

The State conflates standing with relief. A plaintiff must show standing "for each claim he seeks to press" and "each form of relief sought."[41] The Clinic has done so, as it pursued its constitutional claims on behalf of its patients, and its requested form of relief (permanent injunction of the Act) redressed the Act's pre-viability ban on abortions, which is an injury traceable to the State. This challenge to the *scope* of relief is better addressed in terms of the court's exercise of discretion in tailoring the remedy, not in terms of standing.

To that end, the State argues the district court should have narrowly tailored the permanent injunctive relief to the injury, which it contends is the Clinic's inability to perform abortions up to 16 weeks LMP. The State argues it was error to facially invalidate the Act without first considering its constitutionality as applied to the Clinic and its patients. The State asks us to vacate the relief granted and order the district court to craft a remedy tailored to its view of the actual dispute, which is whether the Act is unconstitutional as applied to abortions performed at or before 16 weeks LMP.

In *June Medical Services v. Gee*, decided two months before the district court's order, we "resolve[d] the appropriate framework for reviewing facial challenges to abortion statutes."[42] We concluded that the Supreme Court

---

[41] *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006).

[42] 905 F.3d 787, 801 (5th Cir. 2018), *cert. granted*, --- S. Ct. ----, 2019 WL 4889929

No. 18-60868

eliminated the uncertainty by adopting, in *Hellerstedt*, the *Casey* plurality's test: An abortion restriction is facially invalid if "in a large fraction of the cases in which it is relevant, it will operate as a substantial obstacle."[43] The relevant denominator includes only "those women for whom the provision is an actual rather than an irrelevant restriction[,]" which is a narrower category than "all women," "pregnant women," or even "women seeking abortions identified by the State."[44]

Here, the Act is invalid as applied to every Mississippi woman seeking an abortion for whom the Act is an actual restriction, never mind a large fraction of them.[45] And for those women, the obstacle is insurmountable, not merely substantial. That the Act applies both pre- and post-viability does not save it. Mississippi has already banned all abortions after 20 weeks by separate statute.[46] The only women to whom the Act is an actual restriction, then, are those who seek abortions before 20 weeks; the Act is redundant of existing Mississippi law as to all abortions after that point. This is the tack taken by the Ninth Circuit in *Isaacson*, where Arizona's 20-week ban only had practical significance until viability because Arizona separately bans post-viability abortion:

> [G]iven the controlling, substantive legal standards, [the 20-week law] is invalid as applied to every woman affected by its

---

(mem.) (Oct. 4, 2019).

[43] *Id.* at 801–02 (quoting *Casey*, 505 U.S. at 895). We noted that earlier decisions had used the "no set of circumstances" standard of *United States v. Salerno*, 481 U.S. 739, 745 (1987). *Id.*

[44] *Id.* (quoting *Hellerstedt*, 136 S. Ct. at 2320).

[45] *Jackson*, 349 F. Supp. 3d at 544. Of course, as the district court acknowledged, the practical result of as-applied relief would be the same as that of facial relief, since the Clinic is the only abortion provider in Mississippi.

[46] *See* MISS. CODE ANN. § 41–41–137 (prohibiting anyone from performing abortions after 20 weeks' gestational age).

No. 18-60868

prohibition on abortions. In other words, there is a one hundred percent correlation between those whom the statute affects and its constitutional invalidity as applied to them. . . . [G]iven the one hundred percent correlation, there is no doubt the special rule that applies to facial challenges in abortion cases—that plaintiffs need only show the law challenged is invalid "in a large fraction of the cases in which [the statute] is relevant[.]"[47]

In *Sojourner T v. Edwards*, we facially invalidated a Louisiana ban criminalizing nearly *all* abortions because its pre-viability applications were clearly unconstitutional under *Casey*.[48] We did so without discussing its theoretically valid post-viability applications (although the Clinic notes that, as has Mississippi here and as had Arizona in *Isaacson*, Louisiana had otherwise banned post-viability abortions, making these possible applications redundant).[49]

Even if we disregarded the separate Mississippi abortion law and even if we were to expand the denominator to include all women seeking abortions rather than only those seeking them before 20 weeks (the period when the Act alters Mississippi law) or those seeking them between 15 and 16 weeks (when the Act has practical significance for women visiting the state's sole abortion provider), the Act would still pose a substantial obstacle in a "large fraction" of cases.[50] It might be plainer still simply to say what other courts have said in

---

[47] *Isaacson*, 716 F.3d at 1230–31.

[48] 974 F.2d 27, 31 (5th Cir. 1992).

[49] *See* La. Stat. Ann. § 40:1061.13.

[50] Under this broader view, we would also reach this determination because we recognize that it is not our role to rewrite an unconstitutional statute. *See United States v. Stevens*, 559 U.S. 460, 481 (2010) ("We will not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain . . . .") (internal quotation marks and citations omitted) (first alteration in original); *see also Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 202 (6th Cir. 1997) (concluding that a ban on the abortion procedure of dilation and extraction was unconstitutional as applied to

No. 18-60868

similar cases: This law is facially unconstitutional because it directly conflicts with *Casey*.[51] Accordingly, the district court did not abuse its discretion in declining to fashion relief narrowly just because the result of the Clinic's internal policies is that no facility in Mississippi provides abortions after 16 weeks LMP.[52]

## IV.

We affirm the judgment of the district court.

---

pre-viability procedures but not as to post-viability procedures but striking the entire statute since the court "essentially would have to rewrite the Act in order to create a provision which could stand by itself"); *R.I. Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001) (striking down statute banning so-called partial birth abortion procedure despite severability provision because the statute "contain[ed] no provisions, sections, subsections, sentences, clauses, phrases or words distinguishing between nonviable and viable fetuses, which would make it capable of being severed").

[51] *See Jane L v. Bangerter*, 102 F.3d 1112, 1116 n.4 (10th Cir. 1996) ("For a woman seeking the nontherapeutic abortion of a fetus that is not viable despite fitting the statutory definition in [the Utah ban on abortions after 20 weeks], however, that section goes beyond creating a hindrance and imposes an outright ban. Rather than apply [*Casey*] in these circumstances, it may be more appropriate simply to conclude that the section is invalid as contrary to controlling Supreme Court precedent precluding a legislature from defining the critical fact of viability as Utah has done here."); *see also McCormack v. Herzog*, 788 F.3d 1017, 1030 (9th Cir. 2015) (concluding 20-week ban was "directly contrary" to *Casey* and thus "facially unconstitutional").

[52] The Eighth Circuit has similarly affirmed relief that was not limited to the abortion clinic's practices. *MKB Mgmt. Corp. v. Burdick*, 16 F. Supp. 3d 1059, 1075 (D.N.D. 2014), *aff'd*, 795 F.3d 768 (8th Cir. 2015) (granting complete injunction against 6-week ban even though the plaintiff clinic stopped performing abortions at 16 weeks).

No. 18-60868

JAMES C. HO, Circuit Judge, concurring in the judgment:

Nothing in the text or original understanding of the Constitution establishes a right to an abortion. Rather, what distinguishes abortion from other matters of health care policy in America—and uniquely removes abortion policy from the democratic process established by our Founders—is Supreme Court precedent. The parties and amici therefore draw our attention not to what the Constitution says, but to what the Supreme Court has held.[1]

A good faith reading of those precedents requires us to affirm. Tellingly, the able counsel who brought this appeal on behalf of the State of Mississippi did not even request oral argument, notwithstanding the high stakes for their clients—the constitutionality of a recent enactment of profound moral significance to the citizens of Mississippi. That omission makes no sense but for the fact that Supreme Court precedent requires affirmance.

I am nevertheless deeply troubled by how the district court handled this case. The opinion issued by the district court displays an alarming disrespect for the millions of Americans who believe that babies deserve legal protection during pregnancy as well as after birth, and that abortion is the immoral, tragic, and violent taking of innocent human life. Notably, the States of Texas

---

[1] It is well established that this body of precedent admittedly rests not on constitutional text, but on a doctrine of unenumerated, judicially created rights. Justice Blackmun once said, for example, that doctrines "[l]ike the *Roe* framework . . . are not, and do not purport to be, rights protected by the Constitution." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 548 (1989) (Blackmun, J., concurring in part and dissenting in part). *See also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847, 853 (1992) (discussing judicial enforcement of rights like abortion that are "mentioned nowhere in the Bill of Rights"); *Roe v. Wade*, 410 U.S. 113, 152–53 (1973) (admitting that "[t]he Constitution does not explicitly mention" rights like abortion); *Washington v. Glucksburg*, 521 U.S. 702, 756, 763 (1997) (Souter, J., concurring in the judgment) (discussing the Supreme Court's "practice in recognizing unenumerated, substantive limits on governmental action" in areas such as abortion).

No. 18-60868

and Louisiana devote the majority of their amicus brief to the unusual but unfortunately warranted request that we explicitly disapprove of the district court opinion.

The district court no doubt believes that its opinion faithfully reflects one side of the debate—the side that believes that abortion is a necessary component of a woman's personal autonomy. But the Supreme Court has made clear that *both* sides of the debate deserve respect. "Men and women of good conscience can disagree . . . about the profound moral and spiritual implications of terminating a pregnancy." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 850 (1992). Countless Americans believe in good faith that abortion is "nothing short of an act of violence against innocent human life." *Id.* at 852. The majority in *Casey* even acknowledged that "[s]ome of us as individuals find abortion offensive to our most basic principles of morality." *Id.* at 850.

Instead of respecting all sides, the district court opinion disparages the Mississippi legislation as "pure gaslighting." It equates a belief in the sanctity of life with sexism, disregarding the millions of women who strongly oppose abortion. And, without a hint of irony, it smears Mississippi legislators by linking House Bill 1510 to the state's tragic history of race relations, while ignoring abortion's own checkered racial past.

Supreme Court precedent dictates abortion policy in America. So I am duty bound to affirm the judgment of the district court. But I cannot affirm the opinion of the district court.

## I.

Like every other court to consider the issue, the majority concludes that

No. 18-60868

*Casey* prohibits any and all bans on pre-viability abortions. *See*, *e.g.*, *Casey*, 505 U.S. at 879 (plurality opinion) ("[A] State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007).[2] The

---

[2] *See also*, *e.g.*, *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1314 (11th Cir. 2018) ("At [the 15 to 18 week stage of fetal development], it is settled under existing Supreme Court decisions that the State of Alabama cannot forbid [dilation and evacuation abortions] entirely."); *id.* at 1330 (Dubina, J., concurring specially) (same); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing en banc) ("*Casey* and other decisions hold that, until a fetus is viable, a woman is entitled to decide whether to bear a child."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't of Health*, 888 F.3d 300, 305 (7th Cir. 2018), *judgment vacated in part sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam) ("*Casey*'s holding that a woman has the right to terminate her pregnancy prior to viability is categorical."); *id.* at 311 (Manion, J., concurring in the judgment in part and dissenting in part) ("[T]he fact remains that *Casey* has plainly established an absolute right to have an abortion before viability."); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 (8th Cir. 2015) ("[W]e are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions."); *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (banning "*all* abortions between twenty weeks gestational age and viability . . . is directly contrary to the Court's central holding in *Casey* that a woman has the right to 'choose to have an abortion *before viability* and to obtain it without undue interference from the State'") (quoting *Casey*, 505 U.S. at 846); *Edwards v. Beck*, 786 F.3d 1113, 1116–17 (8th Cir. 2015) (per curiam) (enjoining a law "banning abortions after 12 weeks' gestation" because it "prohibits women from making the ultimate decision to terminate a pregnancy at a point before viability"); *Isaacson v. Horne*, 716 F.3d 1213, 1226 (9th Cir. 2013) ("There is therefore no doubt that the twenty-week law operates as a ban on pre-viability abortion and that it cannot stand under the viability rule enunciated repeatedly by the Supreme Court, this circuit, and other circuits."); *id.* at 1233–34 (Kleinfeld, J., concurring) (law barring pre-viability abortions "unquestionably put[s] a 'substantial obstacle' in the path of a woman seeking to abort a previability fetus"); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 165 (4th Cir. 2000) ("[*Casey*] reaffirmed the 'essential holding' of *Roe*—that a woman has a constitutional right to 'choose to have an abortion before viability and to obtain it without undue interference from the State.'") (quoting *Casey*, 505 U.S. at 846); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996) ("[S]ection 302(3) actually operates as an impermissible ban on the right to abort a nonviable fetus."); *Sojourner T v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) ("[*Casey*] held that before viability, a State's interests are not strong enough to support a prohibition of abortion."); *id.* at 31 (Garza, J., concurring specially) (same); *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1270 (E.D. Ark. 2019); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 627–28 (M.D.N.C. 2019); *EMW Women's Surgical Ctr. v. Beshear*, 2019 WL 1233575, at *1 (W.D. Ky. Mar. 15, 2019).

majority therefore concludes that, as a ban on abortions that Mississippi admits occur prior to viability, HB 1510 is inconsistent with *Casey*.

I am aware of no judicial opinion that reads *Casey* differently, and Mississippi and its amici provide none. To the contrary, Mississippi concedes that HB 1510 would be held unconstitutional in every circuit that has addressed such issues to date. I am forced to agree with the majority's application of Supreme Court precedent to this recently enacted and sincerely motivated law, and to conclude that we are duty bound to affirm the judgment.

For its part, Mississippi asserts various interests to justify the law. Among them, the State most vigorously presses its interest in avoiding pain to the unborn baby. To support that interest, Mississippi proffered the declaration of an expert, Dr. Maureen Condic, a professor of neurobiology at the University of Utah who specializes in the development and regeneration of the nervous system.

In her declaration, Dr. Condic explained that, based on current scientific evidence, "[d]uring the time period covered by [HB 1510], the human fetus is likely to be capable of conscious pain perception." She indicated that fetuses may be able to feel pain as early as ten weeks from the last menstrual period (LMP), when "[t]he neural circuitry responsible for the most primitive response to pain . . . is in place." At that point, the "fetus . . . actively withdraw[s] from . . . painful stimulus." That is consistent with the Legislature's finding that, "[a]t twelve weeks [LMP], an unborn human being . . . senses stimulation from the world outside the womb." Gestational Age Act, ch. 393, § 1(2)(b)(i)(6), 2018 Miss. Laws 606, 607.

Furthermore, Dr. Condic noted that it was "universally accepted" that a fetus has a neural network "capable of pain perception" at some point "between

No. 18-60868

[14–20] weeks" LMP. She then discussed various studies showing that fetuses physically respond to painful experiences, including "a recent review of the evidence" that "conclude[d] that from the [fifteenth week LMP] onward, 'the fetus is extremely sensitive to painful stimuli, and that this fact should be taken into account when performing invasive medical procedures on the fetus.'" Based on that evidence, Mississippi argues that nontherapeutic (that is, medically unnecessary) abortions after fifteen weeks LMP are "barbaric" and "brutal and inhumane" and, as such, undermine the State's interest in the life of the unborn child.[3]

A State has an unquestionably legitimate (if not compelling) interest in preventing gratuitous pain to the unborn. Consider how the Supreme Court has construed the Cruel and Unusual Punishments Clause of the Eighth Amendment to forbid executions of convicted murderers that involve unnecessary pain. *See Baze v. Rees*, 553 U.S. 35, 49 (2008) (plurality opinion) ("Our cases recognize that subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment."). It would be surprising if the Constitution *requires* States to

---

[3] Judge Jones has made similar observations: "[N]eonatal and medical science . . . now graphically portrays, as science was unable to do 31 years ago, how a baby develops sensitivity to external stimuli and to pain much earlier than was then believed." *McCorvey v. Hill*, 385 F.3d 846, 852 (5th Cir. 2004) (Jones, J., concurring). She noted that the record contained "submissions from numerous individuals, each holding an MD or PhD, reporting that unborn children are sensitive to pain from the time of conception, and relying on peer-reviewed, scientific journals." *Id.* at 852 n.6 (also citing David H. Munn et al., *Prevention of Allogeneic Fetal Rejection by Tryptophan Catabolism*, 281 SCIENCE 1191 (1998), and Patrick W. Mantyh et al., *Inhibition of Hyperalgesia by Ablation of Lamina I Spinal Neurons Expressing the Substance P Receptor*, 278 SCIENCE 275 (1997)). She ultimately concluded that, "if courts were to delve into the facts underlying *Roe*'s balancing scheme with present-day knowledge, they might conclude that the woman's 'choice' is far more risky and less beneficial, and the child's sentience far more advanced, than the *Roe* Court knew." *Id.* at 852.

No. 18-60868

use execution methods that avoid causing unnecessary pain to convicted murderers, but does not even *permit* them from preventing abortions that cause unnecessary pain to unborn babies.

Not surprisingly, then, members of the Supreme Court have acknowledged that avoidance of pain is indeed a valid state interest in the abortion context. Both Justice Blackmun and Justice Stevens have thought "it obvious that the State's interest in the protection of an embryo . . . increases progressively and dramatically as the organism's capacity to feel pain, to experience pleasure, to survive, and to react to its surroundings increases day by day." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 552 (1989) (Blackmun, J., concurring in part and dissenting in part) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 778 (1986) (Stevens, J., concurring)). *See also id.* at 569 (Stevens, J., concurring in part and dissenting in part) ("There can be no interest in protecting the newly fertilized egg from physical pain or mental anguish, because the capacity for such suffering does not yet exist; respecting a developed fetus, however, that interest is valid.").

The State of Mississippi did not cite any of those authorities. That is presumably because, although *Casey* acknowledged that "time has overtaken some of *Roe*'s factual assumptions," and that further developments in science and medicine may warrant further legal change, the Court ultimately fixed the line at viability, not pain. 505 U.S. at 860.

Because *Casey* establishes viability as the governing constitutional standard, I am duty bound to conclude that the district court did not abuse its discretion in forbidding discovery and fact development on the issue of pain. But neither would it have been an abuse of discretion if the district court had *permitted* discovery and fact development on the issue of pain.

22

No. 18-60868

As the Federal Rules of Civil Procedure state, discovery may be permitted for "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering [*inter alia*] the importance of the issues at stake in the action." FED. R. CIV. P. 26(b)(1). Relevance "encompass[es] any matter that bears on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Notably, nothing in the Federal Rules of Civil Procedure forecloses discovery based on a good faith expectation of legal change. To the contrary, the Rules expressly envision that parties may need to litigate in anticipation of such change. *See*, *e.g.*, FED. R. CIV. P. 11(b)(2) (permitting parties to make "claims, defenses, and other legal contentions . . . warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"); FED. R. CIV. P. 26(g)(1)(B)(i) (permitting "discovery request[s]" that are, *inter alia*, "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law"); *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 425 (9th Cir. 2012) ("Federal Rule of Civil Procedure 26(g)(1)(B) requires parties seeking discovery to act . . . consistently with the rules of existing law or with good reason to change the law."); *Builders Ass'n of Greater Chi. v. City of Chicago*, 215 F.R.D. 550, 554 (N.D. Ill. 2003) (noting that a subpoena is unduly burdensome "if the information is wholly irrelevant under any reasonable legal theory," but not if it rests on "a basis for a good faith argument for the extension, modification, or reversal of existing law").

Federal courts in other circuits have thus permitted, as well as denied, fact development on the issue of fetal pain. *Compare Bryant v. Woodall*, 2017

No. 18-60868

WL 1292378, at *7 (M.D.N.C. Apr. 7, 2017) (permitting discovery), *with MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 n.4 (8th Cir. 2015) (affirming an "order limiting discovery to the issue of viability").

So nothing prevented the district court from allowing Mississippi to pursue discovery and to develop facts necessary to its defense—including for the purpose of arguing for a change in precedent on appeal. Indeed, that is what occurred in both the Kansas and Delaware trial court proceedings leading up to the Supreme Court's landmark ruling in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

Prior to *Brown*, two Supreme Court decisions—*Plessy v. Ferguson*, 163 U.S. 537 (1896) and *Gong Lum v. Rice*, 275 U.S. 78 (1927)—governed the constitutionality of segregated primary and high schools. *Brown v. Bd. of Educ. of Topeka*, 98 F. Supp. 797, 800 (D. Kan. 1951). Under those precedents, any evidence that "segregation itself" would result in African American students "receiving inferior educational opportunities . . . was immaterial to the [constitutional] conclusion." *Gebhart v. Belton*, 91 A.2d 137, 153 (Del. 1952). Yet the trial courts in both Kansas and Delaware nevertheless made findings that segregated schools would result in "a feeling of inferiority" in African American students—in language that all but amounted to a direct challenge to then-governing Supreme Court precedent. *See Brown*, 347 U.S. at 494 & n.10 (quoting findings).

What's more, the Supreme Court *credited* those findings in *Brown*. The Court noted that "[t]he effect of [segregation on African American students] was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the [African American] plaintiffs." *Id.* at 494. And it noted that "[a] similar finding was made in the Delaware case." *Id.* at

24

No. 18-60868

494 n.10 (quoting finding).

In sum, in the run-up to *Brown*, trial courts permitted fact development, considered the evidence, and even issued findings of fact on an issue that was legally irrelevant under then-governing Supreme Court precedent.  Nothing prevented the district court from doing the same here.

The district court's unwillingness to follow the path of the trial courts in *Brown* may not be reversible error.  But it is unfortunate.  If courts grant convicted murderers the right to discovery to mitigate pain from executions, there's no reason they shouldn't be even more solicitous of innocent babies.[4]

## II.

Having invoked relevance to deny evidentiary development concerning fetal pain, the district court then ignored relevance to consider a wide range of historical matters entirely unconnected to the enactment of HB 1510 in order to impugn the motivations of citizens and policymakers who believe in the sanctity of life.

It is worth quoting the district court in full:

[T]his Court concludes that the Mississippi Legislature's professed interest in "women's health" is pure gaslighting.  In its legislative findings justifying the need for this legislation, the Legislature cites *Casey* yet defies *Casey*'s core holding.  The State "ranks as the state with the most [medical] challenges for women, infants, and

---

[4] Judge Jones has drawn similar comparisons.  *See McCorvey*, 385 F.3d at 852 (Jones, J., concurring) ("[B]ecause the Court's rulings have rendered basic abortion policy beyond the power of our legislative bodies, the arms of representative government may not meaningfully debate McCorvey's evidence.  The perverse result of the Court's having determined through constitutional adjudication this fundamental social policy, which affects over a million women and unborn babies each year, is that the facts no longer matter.  This is a peculiar outcome for a Court so committed to 'life' that it struggles with the particular facts of dozens of death penalty cases each year.").

No. 18-60868

children" but is silent on expanding Medicaid.    Ryan Sit, *Mississippi has the Highest Infant Mortality Rate and is Expected to Pass the Nation's Strictest Abortion Bill*, Newsweek, March 19, 2018.  Its leaders are proud to challenge *Roe* but choose not to lift a finger to address the tragedies lurking on the other side of the delivery room: our alarming infant and maternal mortality rates. *See, e.g.*, Lynn Evans, *Maternal Deaths Still on the Increase*, The Clarion Ledger, March 31, 2018; Danielle Paquette, *Why Pregnant Women in Mississippi Keep Dying*, Wash. Post, April 24, 2015.

No, legislation like H.B. 1510 is closer to the old Mississippi—the Mississippi bent on controlling women and minorities.    The Mississippi that, just a few decades ago, barred women from serving on juries "so they may continue their service as mothers, wives, and homemakers." *State v. Hall*, 187 So.2d 861, 863 (Miss. 1966).  The Mississippi that, in Fannie Lou Hamer's reporting, sterilized six out of ten black women in Sunflower County at the local hospital—against their will.  *See* Rickie Solinger, *Wake Up Little Susie* 57 (1992).  And the Mississippi that, in the early 1980s, was the last State to ratify the 19th Amendment—the authority guaranteeing women the right to vote.  *See* Marjorie Julian Spruill & Jesse Spruill Wheeler, *Mississippi Women and the Woman Suffrage Movement*, Mississippi History Now.

*Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 540 n.22 (S.D. Miss. 2018).  The court went on:

The Mississippi Legislature has a history of disregarding the constitutional rights of its citizens.  *See, e.g.*, *Alexander v. Holmes Cty. Bd. of Ed.*, 396 U.S. 19, 20 (1969) (15 years after *Brown v. Board*, Mississippi continued to maintain segregated schools, prompting the Supreme Court to tell the State that it was "the obligation of every school district . . . to terminate dual school systems at once and to operate now and hereafter only unitary schools."); *Campaign for Southern Equality v. Bryant*, 791 F.3d 625, 627 (5th Cir. 2015) (striking down Mississippi's ban on same-sex marriage, explaining that "*Obergefell*, in both its Fourteenth and First Amendment iterations, is the law of the land and,

consequently, the law of this circuit"); *ACLU v. Fordice*, 969 F. Supp. 403, 405 (S.D. Miss. 1994) (reciting how State legislature created and funded the Sovereignty Commission "to maintain racial segregation in the South despite orders to the contrary by the United States Supreme Court. As the secret intelligence arm of the State, the Commission engaged in a wide variety of unlawful activity"); *Jackson Women's Health Organization v. Amy*, 330 F. Supp. 2d 820 (S.D. Miss. 2004) (enjoining state statute that eliminated organization's ability to perform abortions early in second trimester); *Campaign for Southern Equality v. Miss. Dep't of Hum. Serv.*, 175 F. Supp. 3d 691, 697 (S.D. Miss. 2016) (striking down Mississippi statute prohibiting adoption by married gay couples); *Stewart v. Waller*, 404 F. Supp. 206 (N.D. Miss. 1975) (striking down at-large alderman election statute as purposeful device conceived to violate the Fourteenth and Fifteenth Amendments in furtherance of racial discrimination).

*Id.* at 543 n.40.

I find it deeply disquieting that a federal court would disparage the millions of Americans who believe in the sanctity of life as nothing more than "bent on controlling women and minorities" and "disregarding their rights as citizens." Those insults not only directly conflict with the Supreme Court's admonitions that both sides of the debate deserve respect—they are also demonstrably incorrect.

## A.

Consider, for example, the district court's claim that it is sexist to believe in the protection of the unborn. The Supreme Court has articulated precisely the opposite sentiment: "Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both

No. 18-60868

sides of the issue." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). *See also id.* at 326 (Stevens, J., dissenting) (acknowledging that "many women *oppose* abortion"). "Men and women of good conscience can disagree . . . about the profound moral and spiritual implications of terminating a pregnancy." *Casey*, 505 U.S. at 850.[5]

Moreover, according to a reputable survey of national opinion, *more* women than men describe themselves as "pro-life." *Abortion Trends by Gender*, GALLUP, https://news.gallup.com/poll/245618/abortion-trends-gender.aspx (last visited Dec. 2, 2019) (noting that, in 2019, 51% of women and 46% of men in the United States self-identify as "pro-life"). Likewise, many feminists, both past and present, view "abortion [as] part and parcel of women's oppression." MARY KRANE DERR & LINDA NARANJO-HUEBL, PROLIFE FEMINISM: YESTERDAY & TODAY 12 (Rachel MacNair ed. 1995). *See also*, *e.g.*, *id.* at 5 ("[T]here is a motif in feminism which began long ago and has endured to the present day. This is the theme of abortion as an injustice against fetal life which originates with injustice against female life."); Brief Amici Curiae of Feminists for Life of America; Massachusetts Citizens for Life, Inc.; Pro-Life Legal Defense Fund, Inc.; and University Faculty for Life in Support of Petitioners, *Stenberg v. Carhart*, 530 U.S. 914 (2000) (No. 99-830), 2000 WL 207161, at *1 ("[Feminists for Life] is dedicated to securing basic human rights for all people, especially women and children, from conception until the natural end of life. Among its members are women who oppose [partial-birth abortion] as a threat to the lives of women and children."); Erika Bachiochi, *Embodied Equality: Debunking*

---

[5] The district court did not acknowledge this statement from *Casey*. *Compare Jackson Women's Health Org.*, 349 F. Supp. 3d at 540 n.22 (disparaging the Mississippi Legislature for "defy[ing]" *Casey*).

No. 18-60868

*Equal Protection Arguments for Abortion Rights*, 34 HARV. J.L. & PUB. POL'Y
889, 890 (2011) ("[A] growing segment of women instead echoes the views of
the early American feminists, who believed that abortion was not only an
egregious offense against the most vulnerable human beings, but that it was
also an offense against women and women's equality.").

## B.

What's more, the district court's claim that it is racist to believe in the
sanctity of life is particularly noxious, considering the racial history of abortion
advocacy as a tool of the eugenics movement.

Eugenics—the concept of improving the human race through control of
the reproductive process—has frequently been associated with explicitly racist
viewpoints. "Many eugenicists believed that the distinction between the fit
and the unfit could be drawn along racial lines." *Box v. Planned Parenthood of
Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1785 (2019) (Thomas, J., concurring)
(providing examples). Many eugenics programs, such as sterilization,
explicitly targeted minorities—as the district court rightly acknowledged.
*Jackson Women's Health Org.*, 349 F. Supp. 3d at 541 n.22 (noting that
"Mississippi . . . sterilized six out of ten black women in Sunflower County at
the local hospital—against their will").

"From the beginning, birth control and abortion were promoted as means
of effectuating eugenics." *Box*, 139 S. Ct. at 1787 (Thomas, J., concurring). *See
also id.* ("[A]bortion is an act rife with the potential for eugenic manipulation.");
*id.* at 1788 (discussing Margaret Sanger's view that birth control would help
control the African American population); *id.* at 1789 ("Support for abortion
can . . . be found throughout the literature on eugenics."); DAVID T. BEITO &

No. 18-60868

LINDA ROYSTER BEITO, BLACK MAVERICK: T.R.M. HOWARD'S FIGHT FOR CIVIL RIGHTS AND ECONOMIC POWER 215 (2009) (noting that some African American civil rights leaders "fretted about the racist implications of abortion"). Indeed, among past abortion advocates were "some eugenicists [who] believed that abortion should be legal for the very *purpose* of promoting eugenics." *Box*, 139 S. Ct. at 1789 (Thomas, J., concurring).

Advocates of eugenics might well celebrate, then, that abortion "has proved to be a disturbingly effective tool for implementing the discriminatory preferences that undergird eugenics." *Id.* at 1790–91 (Thomas, J., concurring) (providing examples). *See also id.* at 1791 (noting that the current "abortion ratio . . . among black women is nearly 3.5 times the ratio for white women"); William McGurn, *White Supremacy and Abortion*, WALL ST. J. (Sept. 24, 2019), https://www.wsj.com/articles/white-supremacy-and-abortion-11567460392 (discussing "why so many African-Americans, especially African-American women, have been leaders in the pro-life cause"); *id.* ("Catherine Davis of the Restoration Project . . . notes that the estimated 20 million black abortions since *Roe v. Wade* in 1973 are more than the entire African-American population in 1960.").[6]

Given the links between abortion and eugenics, accepting the district court's logic—connecting Mississippi's own tragic racial history with the recent enactment of HB 1510—means that the history of abortion advocacy must likewise haunt modern proponents of permissive abortion policies, and infect

---

[6] Abortion proponents have expressed similar concerns. *See* Elizabeth Dias & Lisa Lerer, *How a Divided Left Is Losing the Battle on Abortion*, N.Y. TIMES (Dec. 1, 2019), https://nyti.ms/34ypQkN ("If all we do as an organization is pay for abortions for low-income people, we are eugenicists.") (quoting Amanda Reyes, director of the Yellowhammer Fund).

them with the taint of racism as well.  So where does that leave us?  Are *both* sides of the abortion debate racist?  I don't imagine the district court would say so.  And if not, then the principle invoked by the district court is no principle at all, but merely an instrument with which to bludgeon one side of the abortion debate.[7]

\* \* \*

Federal judges are not elected.  Yet the Constitution grants us life tenure.  That is not because we are supposed to decide cases based on personal policy preference.  It is because we swear an oath to rule based on legal principle alone.  I share in the concern, expressed by every state in this circuit, that the district court did not discharge that duty here, and that its opinion diminishes public confidence in the federal judiciary.

It is troubling enough to many Americans of good faith that federal courts, without any basis in constitutional text or original meaning, restrict

---

[7] The district court opinion not only belittles one side of the abortion debate—it also defies our Founders' vision of the judiciary, when it states that "[t]he fact that men, myself included, are determining how women may choose to manage their reproductive health is a sad irony not lost on the Court." *Jackson Women's Health Org.*, 349 F. Supp. 3d at 545.  To begin with, that statement confuses the role of the courts with that of the legislative branch.  The courts did not enact HB 1510 into law—the Mississippi Legislature did.  No federal judge anywhere in the nation—and certainly none who respect the proper role of the judiciary under our Constitution—would impose a policy like HB 1510 from the bench.  *See, e.g., Casey*, 505 U.S. at 979 (Scalia, J., concurring in the judgment in part and dissenting in part) ("The States may, if they wish, permit abortion on demand, but the Constitution does not *require* them to do so.").  Moreover, the suggestion that a judge's demographic background bears upon the validity or intellectual integrity of a decision reflects a troubling view of judging.  It is a direct attack on the principle of judicial objectivity and impartiality—that judges rule based on legal principle alone, without regard to the demographics of the parties or the judge.  Our Founders famously envisioned a judiciary capable of ruling based on "judgment," not "will."  THE FEDERALIST NO. 78, at 464 (Alexander Hamilton) (Kesler ed., 1999).  *See also, e.g., id.* at 470 ("To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents.").

No. 18-60868

the ability of states to regulate in the area of abortion.  But that is of course what decades of Supreme Court precedent mandates.  Accordingly, I am required to affirm.

It adds insult to injury, however, for a federal court to go further and to impugn the motives of those good faith Americans.  When that occurs, citizens may rightfully wonder whether judges are deciding disputes based on the Rule of Law or on an altogether different principle.  Replacing the Rule of Law with a regime of Judges Know Better is one that neither the Founders of our country nor the Framers of our Constitution would recognize.

I concur in the judgment.